# CHAPTER 7 – THE FDIC'S ROLE AS RECEIVER

Before the creation of the Federal Deposit Insurance Corporation (FDIC), the Office of the Comptroller of the Currency (OCC), which had the authority to appoint the receiver of a failed national bank, supervised national bank liquidations. Liquidations of state banks varied considerably from state to state, but most were handled under the provisions for general business insolvencies.

The U.S. Congress recognized the importance of deposit protection in providing stability in the nation's economy. As such, Congress gave the FDIC special powers to use in the liquidation of assets from failed banks or thrifts and the payment of claims against the receivership estate. Federal laws governing the resolution of failed depository institutions were designed to promote the efficient and expeditious liquidation of failed banks and thrifts. The more significant of those powers are detailed below.

## Comparison with Bankruptcy Law

In many ways the powers of the FDIC as receiver of a failed institution are similar to those of a bankruptcy trustee. Like a bankruptcy trustee, a receiver steps into the shoes of an insolvent party. The receiver may liquidate the insolvent institution or transfer some or all of its assets to an acquiring institution. Although many of the concepts central to the operation of an FDIC receivership are similar to those of the bankruptcy process, federal law grants the FDIC additional powers that lead to critical differences between bankruptcy and the FDIC receivership law.

The FDIC's role and responsibilities when serving as receiver are defined by specific statutory provisions contained in the Federal Deposit Insurance Act of 1950. These additional powers allow the FDIC to both expedite the liquidation process for banks and thrifts in order to maintain confidence in the nation's banking system and to maximize the cost-effectiveness of the receivership process to preserve a strong insurance fund. The primary advantage is that the FDIC, in administering the assets and liabilities of a failed institution as its receiver, is not subject to court supervision, and its decisions are not reviewable except under very limited circumstances. A few key differences are—

- <u>Claims Process.</u>  A receiver has the power to allow or disallow claims. The holder of a disallowed claim may litigate its claim in federal district court. A bankruptcy trustee can object to a claim, but the decision of whether to allow or disallow the claim is made by the bankruptcy court.

- <u>Contract Repudiation.</u>  A receiver may repudiate any burdensome contract within a "reasonable time" of its appointment. A bankruptcy trustee can repudiate only executory contracts.

- Stay of Litigation.  A receiver can request a stay of legal proceedings of up to 90 days.  The automatic stay in bankruptcy becomes effective immediately upon the filing of a bankruptcy petition.

- Avoidance Powers.  Both a receiver and a bankruptcy trustee have avoidance powers.  A receiver can pursue fraudulent transfers by obligors of a failed financial institution made with the intent to hinder, delay, or defraud the institution.  This power applies to transfers made five years before or after the date of the receiver's appointment.  A bankruptcy trustee can avoid fraudulent transfers and recover property for the bankruptcy estate.

- Special Defenses.  A receiver has special statutory defenses that it can use to defeat the defenses of obligors of a failed institution.  A bankruptcy trustee generally can use only the defenses that were available to the debtor to defeat claims.

A more detailed discussion of the FDIC's special receivership powers follows later in this chapter.

## Why the FDIC Acts as Receiver

To understand why the U.S. Congress gave the FDIC the powers it has, it is necessary to look at the structure of the banking industry and the conditions of the 1930s.  The FDIC was created in 1933 to halt a banking crisis.  Nine thousand banks—a third of the banking industry in the United States at that time—failed in the four years before the FDIC was established.  The failure of one bank set off a chain reaction, bringing about other failures.  Sound banks frequently failed when large numbers of depositors panicked and demanded to withdraw their deposits, leading to "runs" on the banks.  The behavior of depositors was not irrational.  They had learned from hard experience that if they kept their money in a bank, the money might not be available when they needed it, and they might lose a large portion of it if their bank failed.

Before the creation of the FDIC, the OCC supervised national bank liquidations.  Liquidations of state banks were generally handled under the provisions for general business insolvencies.  By 1933, most state banking authorities had at least some control over state bank liquidations.  However, the increased incidence of national bank failures from 1921 through 1932 created a shortage of experienced receivers.  Furthermore, there were concerns that appointments of receivers, both national and state, had been handed out as political favors, with the recipients attempting to make large commissions and to extend the work as long as possible.

In general practice, between 1865 and 1933, depositors of national and state banks were treated in the same way as other creditors—they received funds from the liquidation of the bank's assets *after* those assets were liquidated.  On average, it took about six years at the federal level to liquidate a failed bank's assets, to pay the depositors, and to close the bank's books—although in at least one instance this process took 21 years.  Even when depositors did ultimately receive their funds, the amounts were significantly less than they had originally deposited into the banks.  From 1921 through

1930, more than 1,200 banks failed and were liquidated. From those liquidations, depositors at state chartered banks received, on average, 62 percent of their deposits back. Depositors at banks chartered by the federal government received an average of 58 percent of their deposits back. Given the long delays in receiving any money and the significant risk in getting their deposits back, it was understandable why anxious depositors withdrew their savings at any hint of problems. With the wave of banking failures that began in 1929, it became widely recognized that the lack of liquidity that resulted from the process for resolving bank failures contributed significantly to the economic depression in the United States.[1]

To deal with the crisis, the government of the United States focused on returning the financial system to stability by restoring and maintaining the confidence of depositors in the banking system. When it created the FDIC, the U.S. Congress addressed that problem by (1) providing that the FDIC would insure deposits up to the deposit limit, initially up to $2,500, but now up to $100,000; (2) giving the FDIC special powers to resolve failed banks; and (3) requiring the appointment of the FDIC as receiver for all national banks. Congress believed that the appointment of the FDIC simplified procedures, eliminated duplication of records, and vested responsibility for liquidation in the largest creditor (the FDIC in its corporate capacity, as subrogee for the insured deposits it had paid), whose interest was to obtain the maximum possible recovery. For state chartered banks, the U.S. Congress preferred that the FDIC be receiver, but allowed each state to appoint a receiver according to state law. By 1934, 30 states had provisions under which the FDIC could be appointed receiver but, in practice, most states often did not do so. Today, however, it is the rare exception when the FDIC is not appointed, and most states now require that the FDIC be appointed as receiver.

## How the FDIC Becomes a Receiver

A depository institution's charter determines which state or federal regulatory agency will appoint a conservator or a receiver for a failing institution.[2] For federal savings associations and national banks, the Office of Thrift Supervision and the Office of the Comptroller of the Currency, respectively, are the chartering authorities responsible for determining when the appointment of a receiver is necessary. The FDIC must be appointed as receiver for insured federal savings associations and national banks. For state chartered savings and loan associations or banks, the FDIC may accept appointment as receiver by the appropriate state regulatory authority, but it is not required to do so. In the case of state chartered banks that are members of the Federal Reserve System, the state banking authority may also appoint the FDIC as receiver. In certain limited instances, the FDIC may appoint itself as receiver for a state chartered insured depository institution. In 1991, the U.S. Congress provided the FDIC that additional authority to appoint itself receiver out of concern that the FDIC depended on the judgment of individual state chartering authorities or that

---

[1] C.D. Bremer, *American Bank Failures* (New York: Columbia University Press, 1935), chapters IV and V.

[2] The same authority would appoint the FDIC as conservator for the institution if the imposition of a conservatorship were determined to be the appropriate strategy for dealing with a failing institution. However, the FDIC has never been appointed conservator by the OCC or a state regulatory authority and may decline the appointment if tendered; the FDIC was appointed conservator once by the Office of Thrift Supervision.

of other federal chartering authorities. Also, Congress needed an independent basis to protect the insurance fund in a timely manner. Since receiving that power in 1991, however, the FDIC has closed an institution and appointed itself as receiver only once, in the 1994 failure of The Meriden Trust & Safe Deposit Company, Meriden, Connecticut.

The FDIC as receiver is functionally and legally separate from the FDIC acting in its corporate role as deposit insurer, and the FDIC as receiver has separate rights, duties, and obligations from those of the FDIC as insurer. Courts have long recognized these dual and separate capacities.

## The FDIC's Functions as Receiver

The U.S. Congress has entrusted the FDIC with virtually complete responsibility for resolving failed federally insured depository institutions and has conferred expansive powers to ensure the efficiency of the process. In exercising this significant authority, the FDIC is required by statute to maximize the return on the assets of the failed bank or thrift and to minimize any loss to the insurance funds.

A receivership is designed to market the assets of a failed institution, liquidate them, and distribute the proceeds to the institution's creditors. The FDIC as receiver succeeds to the rights, powers, and privileges of the institution and its stockholders, officers, and directors. The FDIC may collect all obligations and money due to the institution, preserve or liquidate its assets and property, and perform any other function of the institution consistent with its appointment.

A receiver also has the power to merge a failed institution with another insured depository institution and to transfer its assets and liabilities without the consent or approval of any other agency, court, or party with contractual rights. Furthermore, a receiver may form a new institution, such as a bridge bank, to take over the assets and liabilities of the failed institution, or it may sell or pledge the assets of the failed institution to the FDIC in its corporate capacity.[3]

The FDIC as receiver is not subject to the direction or supervision of any other agency or department of the United States or of any state, in the operation of the receivership. These provisions allow the receiver to operate without interference from other executive agencies and to exercise its discretion in determining the most effective resolution of the institution's assets and liabilities.

In many respects, the powers of a receiver and a conservator are similar. Many of the statutory powers of a receiver, however, are expressly conferred upon a conservator, while certain powers are limited to the receiver. The guiding principle is to grant to the FDIC acting in either capacity those powers and obligations most consistent with performance of its statutory role. A conservatorship is designed to operate the institution for a period of time to return the institution to a sound and solvent

---

[3] While the FDIC in either its corporate or receivership capacity can establish a bridge bank, to date all bridge banks have been established by the FDIC in its corporate capacity. Refer to Chapter 3, Purchase and Assumption Transactions, for further discussion of bridge banks.

operation. While in conservatorship, the institution remains subject to the supervision of the appropriate state or federal banking agency. The conservator's goal is to preserve the "going concern" value of the institution. For example, a conservator, like a receiver, is empowered to disaffirm or repudiate contracts such as leases, but it may choose not to do so if the contracts would benefit the open institution.

### The FDIC's Closing Function

When its chartering authority closes a bank or thrift and appoints the FDIC as receiver, the first task for the FDIC is to take custody of the failed institution's premises and all its records, loans, and other assets. After taking possession of the premises, the FDIC posts notices to explain the action to the public and changes locks and combinations as soon as possible. It then notifies correspondent banks and other appropriate parties of the closing.

The FDIC closing staff, working in conjunction with employees of the failed institution, bring all accounts forward to the closing date and post all applicable entries to the general ledger, making sure that everything is in balance. The FDIC then creates two complete sets of inventory books containing an explanation of the disposition of the failed institution's assets and liabilities, one set for the assuming institution (if there is one) and one for the receivership.

### Resolution of Claims Against the Failed Institution

Immediately after its appointment, the FDIC as receiver must notify the failed institution's creditors (which include customers with uninsured deposits) to submit their claims to the receiver. The FDIC arranges for a notice to be published in a local newspaper stating that the financial institution has failed and how claimants may file their claims. The receiver must also mail notices to file claims to all creditors identified in the institution's records.

All claimants, including those who may have been suing the failed institution, must then file proof of their claims with the receiver by a specified deadline. The receiver may seek to put any pending litigation to which the failed institution was a party on hold. Once a claim has been filed, the receiver has 180 days to determine if the claim should be allowed. If the receiver is not satisfied that the claim has merit, the claim will be disallowed.

An allowed claim will be paid on a pro rata basis with other allowed claims of the same class, to the extent there are funds available in the receivership after the expenses are paid. If a creditor's claim is denied, the creditor may seek judicial review of the claim by filing a lawsuit or continuing pending litigation within 60 days after the date the claim is denied. If the receiver has not acted on the claim within 180 days of its filing, it is deemed to have been disallowed and the creditor may file suit within 60 days thereafter.

Payment of Claims

The priority for paying allowed claims against a failed depository institution is now determined by federal law. On August 10, 1993, a uniform distribution plan for depository institutions, the National Depositor Preference Amendment, became effective. The law gives payment priority to depositors, including the FDIC as subrogee, over general unsecured creditors. Inasmuch as most liabilities of a failed institution are deposit liabilities, the practical effect of depositor preference in most situations is to eliminate any recovery for unsecured general creditors. The statute applies to all receiverships established after its enactment. For receiverships commenced prior to that, distribution of the assets of a failed depository institution was determined according to the law of the chartering jurisdiction, either state or federal. A number of states had depositor preference statutes for their state chartered institutions prior to enactment of the federal statute.

Claims against the failed institution are paid from monies recovered by the receiver through its liquidation efforts. Under the National Depositor Preference Amendment and related statutory provisions, claims are paid in the following order of priority:

1. Administrative expenses of the receiver,
2. Deposit liability claims (the FDIC claim takes the position of all insured deposits),[4]
3. Other general or senior liabilities of the institution,
4. Subordinated obligations,[5] and
5. Shareholder claims.

Payments on these claims are known as dividends. Customers with uninsured deposits are sometimes issued advance dividends based on the estimated recovery value of the failed bank's assets. This provides customers with uninsured deposits some reasonable amount of liquidity protection without eliminating the incentive for large depositors to exercise market discipline.

Advance dividends are based on the estimated value of the failed bank's assets. Advance dividends usually range between 50 cents and 80 cents on the dollar of receivership claims. The FDIC does not pay advance dividends when the value of the failed institution's assets can not be reasonably determined at the closing.

Federal law applicable to all depository institution receiverships provides that a receiver's maximum liability to a claimant is an amount equal to what the claimant would have received if the institution's assets had been liquidated.

---

[4] Because of the manner in which the Federal Deposit Insurance Act of 1950 defines a "deposit," foreign deposits do not obtain the benefit of this priority and are paid with the other general or senior liabilities of the institution.

[5] Any liability of the insured depository for a cross guarantee assessment would receive distributions after subordinated debtholders but before distributions were made to shareholders.

## Special Receivership Powers

As mentioned earlier in this chapter, the FDIC as receiver has a number of special powers that have been granted by federal law. A discussion of some of the more significant powers follows.

*Repudiation of Contracts*

A receiver may repudiate or disaffirm a contract of the depository institution if the receiver (1) deems it burdensome, and (2) finds that repudiation would promote the orderly administration of the receivership estate. The power to disaffirm or repudiate a contract simply permits the receiver to terminate the contract, thereby ending any future obligations imposed by the contract. The receiver must act to repudiate a contract within a "reasonable time" after appointment. While the receiver may be liable for damages resulting from the repudiation of a contract, those damages are limited to actual direct compensatory damages determined as of the date of the receiver's appointment.

Slightly different rules apply for contracts that are "qualified financial contracts" (QFC), which include securities contracts, commodity contracts, forward contracts, repurchase agreements, and swap agreements. When the receiver repudiates a QFC, damages are measured as of the date of the repudiation and may include the cost of acquiring a replacement QFC. These special rules are necessary to protect the U.S. financial markets.

*Placing Litigation on Hold*

The receiver is substituted as a party for litigation pending against the failed bank or thrift. However, because the receiver may need time to assess and evaluate the facts of each case to decide whether and how to proceed, the law permits the receiver to request a court to put on hold, or "stay," the litigation. That power also extends to litigation filed after the institution's failure. The receiver must request the stay for it to become effective. The courts, however, cannot decline to issue the stay once the receiver has filed its request.[6]

When litigation resumes after a stay is lifted, the receiver is generally entitled to have the controversy resolved in either state or federal court. Typically, when the litigation is before a state court, the FDIC has the added flexibility to either keep it in state court or to "remove" it to federal court.

A special statute of limitations exists for actions brought by a receiver. Under the statute, the receiver has up to six years to file a contract claim and up to three years to begin a tort suit.[7]

---

[6] A receiver may obtain a stay for 90 days; a conservator is allowed 45 days.

[7] Tort actions are lawsuits that seek compensation for a civil wrong (as opposed to a crime) committed by one party against another party. They include lawsuits for personal injury or property damage due to negligence, as well as suits for libel, false arrest, and other disputes.

*Avoiding Fraudulent Conveyances*

A receiver has the power to avoid certain fraudulent conveyances. Under federal banking law, a receiver may avoid a security interest in a property, even if perfected, in which the security interest is taken in contemplation of the institution's insolvency or with the intent to hinder, delay, or defraud the institution or its creditors. The receiver may avoid any transfers made by obligors within five years of the appointment of the receiver. Those rights are superior to any rights of a trustee or any other party.

*Special Defenses*

Over the years, federal statutes and court decisions have provided certain "special defenses" to the FDIC in its role as receiver to allow for the efficient resolution of a failed institution's affairs.

<u>Improperly documented agreements are not binding on the receiver</u>.  Like a bank regulator, the receiver must be able to rely upon the books and records of the failed financial institution to evaluate its assets and liabilities accurately.  For the receiver, the ability to rely on the failed institution's records in resolving the institution's affairs is critical in completing cost-effective resolution transactions, such as the sale of assets to third parties and to the effective collection of debts due to the failed bank or thrift.

As a result, both the common law (*D'Oench* Doctrine) and its statutory counterparts, *U.S. Code*, volume 12, section 1821(e) and section 1821(d)(9)(A), recognize that, unless an agreement is properly documented in the institution's records, it cannot be enforced either in making a claim or defending against a claim by the receiver.  Therefore, an argument by an obligor on a promissory note that an undocumented, unrecorded side agreement with the failed bank, changes or releases the duty to repay the loan will generally be barred.

<u>Courts may not enjoin the receiver</u>.  The U.S. Congress has provided the FDIC as receiver with additional protection by prohibiting courts from issuing injunctions or similar equitable relief to restrain the receiver from completing its resolution and liquidation activities.  For example, *U.S. Code*, volume 12, section 1821(j), bars an injunction to prevent foreclosures or asset sales.  Similarly, courts are prohibited from issuing any order to attach or execute upon any assets in the possession of the receiver.  These statutory provisions, however, do not bar the recovery of monetary damages.

# Settlement with the Assuming Institution

The FDIC and the assuming institution handle most of their post-closing activities through the "settlement" process.  Adjustments to the closing books may be made between the date of the closing of the institution and the "settlement date."  The settlement date may be from 180 days to 360 days after the bank or thrift closing, depending on the failed institution's size.  Adjustments reflect (1) the exercise of options by the acquirer, (2) either any repurchase of assets by the receiver or any "put

back" of assets to the receiver by the assuming institution, and (3) the valuation of assets sold to the acquirer at market prices.

## Disposal of Assets and Termination of Receivership

In order to have funds to disburse, the FDIC works to dispose of the remaining assets of the failed institution in a timely manner through a variety of methods. In addition, the FDIC conducts an investigation into each failed institution to determine if negligence, misrepresentation, or wrongdoing was committed and, when appropriate, may file a lawsuit to help recover losses caused by these acts.

Receivership termination represents the final process of winding up the affairs of the failed institution. Following payment of eligible claims and final disposition of the assets, the FDIC then proceeds with terminating the receivership. The duration of a receivership varies depending on individual circumstances, such as the type of closing; volume and quality of assets retained by the receivership; and the existence of defensive litigation, environmentally impaired assets, employee benefit plans, and professional liability claims. All significant issues of the receivership must be resolved prior to its termination.