# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| | : | |
| | : | |
| **Plaintiff,** | : | **Civil Action No.** |
| | : | **1:12-cv-2296-TCB** |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **AUBREY LEE PRICE;** | : | |
| **PFG, LLC; PFGBI, LLC;** | : | |
| **MONTGOMERY ASSET** | : | |
| **MANAGEMENT, LLC f/k/a PFG** | : | |
| **ASSET MANAGEMENT, LLC (Florida** | : | |
| **Limited liability company); and** | : | |
| **MONTGOMERY ASSET** | : | |
| **MANGEMENT, LLC  f/k/a PFG** | : | |
| **ASSET MANAGEMENT,** | : | |
| **LLC (Georgia limited liability company),** | : | |
| | : | |
| **Defendants.** | : | |
| _____/ | | |

## RECEIVER'S THIRD STATUS REPORT

Melanie E. Damian, Esq., the court-appointed receiver (the "Receiver") in the above-captioned enforcement action, hereby submits her Third Status Report regarding the present status of the Receivership Estate of Aubrey Lee Price, PFG, LLC, PFGBI, LLC, Montgomery Asset Management, LLC f/k/a PFG Asset

Management, LLC (Florida), and Montgomery Asset Management, LLC f/k/a PFG

Asset Management, LLC (Georgia) (collectively, the "Receivership Defendants").

## I.    INTRODUCTION

Pursuant to the Court's Order Appointing Receiver [D.E. 20] (the "Receivership Order"), entered on July 26, 2012, this Third Status Report shall provide:

- A detailed account of the work performed by the Receiver and her counsel subsequent to the filing of the Receiver's Second Status Report;

- A detailed inventory of the assets marshaled and liquidated by the Receiver;[1]

- A summary of the work performed by the Receiver's forensic accountant;

- A full accounting of Receivership funds, receipts and disbursements; and

- A list of known investors and creditors.

## II.    STATUS OF RECEIVERSHIP SUBSEQUENT TO FILING OF RECEIVER'S SECOND STATUS REPORT

Since the filing of the Receiver's Second Status Report [D.E. 66], the

Receiver and her professionals concentrated their efforts on:

- Pursuing claims against third parties through litigation;

---

[1] An updated list of the assets of the Estate, including liquidated and unliquidated claims, is attached hereto as **Exhibit A**.

- Negotiating with the FDIC in connection with its motion to intervene and for relief from Receivership Order and matters related to certain real properties of the Estate and other competing claims;

- Pursuing claims against insurance policies held by Receivership Defendants;

- Seeking to recover amounts that certain Receivership Defendants loaned to third parties;

- Marketing, selling and/or managing the real property of the Receivership Estate under the control of the Receiver;

- Seeking to acquire ownership interests in foreign properties; and

- Gathering financial records, reconstructing the Receivership Defendants' accounts at various banks and brokerage houses, tracing the funds that investors invested with the Receivership Defendants, and performing forensic analyses.

A full account of the work performed by the Receiver and her professionals for the time period following the filing of the Receiver's Second Status Report [D.E. 66] filed on January 30, 2013 is set forth below:

      A.     <u>Third Party Claims</u>

          *i.  KM Homes Litigation*

As detailed in the Receiver's Second Status Report, the litigation against KM Homes to recover approximately $3 million in loan proceeds is currently in its discovery phase, and the Receiver's counsel has already taken the deposition of Keith McSwain and Steve Roberts, in his capacity as corporate representative of

KM Homes, and has received written discovery requests.  On February 21, 2013, the Receiver filed her Motion to Strike and Dismiss Defendant's Counterclaim, which is still pending before the court.  The Receiver has prepared and intends to file a Motion for Summary Judgment on all her claims against KM Homes within the week of filing this Status Report.  The Receiver will continue to pursue the Estate's claims against KM Homes, and will seek to expedite the adjudication thereof.

> ii. *Demand on Montgomery County Bankshares, Inc. and its Officers and Directors (and Insurer)*

On December 28, 2012, the Receiver issued her initial demand on MCBI and its directors and officers (and its directors and officers liability insurance carrier) for at least $17 million that PFGBI, LLC, as a shareholder of MCBI, and other investors in the Receivership Defendants, invested with MCBI and lost as a result of the misconduct of MCBI and its management.  MCBI maintained at least two directors and officers liability policies with Travelers Insurance Company – one covering misconduct in 2010 with a policy limit of $3 million (effective through mid-2014) and one covering misconduct in 2012 with a policy limit of $1 million (effective through December 31, 2012).  The Receiver continues to investigate her claims against MCBI and its officers and directors for their 2012 misconduct and contemplates that, within the next thirty (30) days, she will

commence a separate action against them to recover the substantial losses incurred by the investors.

### iii.  10(b)(5) Lawsuit Against MCBI

On December 28, 2012, the Receiver filed a complaint in the United States District Court for the Northern District of Georgia, Case No. 1:12-cv-04472, against MCBI, its officers and directors (during the year 2010), seeking to recover damages pursuant to Section 10(b) and 27 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b).  MCBI and the other defendants have sixty (60) days to respond to the Complaint from the date of service.  The Receiver anticipates taking the depositions of multiple persons with knowledge of the events that gave rise to the Receiver's claims within the next thirty (30) days, and taking the depositions of multiple defendants, specifically former officers and directors of MCBI, within the next sixty (60) days.  The Receiver expects these depositions to uncover evidence in support of the Receiver's claims in the pending 10(b)(5) action, as well as additional claims that would be covered under the 2012 D&O Policy for which the Receiver intends to file a separate action.

### iv.  Claims Against Former Professionals of Receivership Entities

During the course of her investigation of the Receivership Defendants and various transactions in which they were involved, the Receiver discovered that a

number of professionals, including attorneys, represented certain of the Receivership Defendants and provided advice and counseling in connection with transactions that resulted in substantial losses by the Receivership Defendants and their investors. In particular, the Receiver discovered that she may have claims against a law firm that represented certain Receivership Defendants in connection with the purchase of Montgomery Bank & Trust ("MB&T" or the "Bank"). Accordingly, the Receiver negotiated and entered into an agreement to toll the statute of limitations for such claims, while the Receiver continues her investigations, and that firm provides additional documents and information relating to the legal services giving rise to such claims.  In the event the Receiver determines that the Estate has a claim, and the firm and/or its insurer is unwilling to settle such claim for a reasonable and appropriate amount, the Receiver will commence litigation and aggressively pursue her claim to maximize the recovery for the Estate.

The Receiver will continue her investigation of other transactions involving former counsel of the Receivership Defendants and, should the Receiver discover any action or omission that gives rise to claims against any such professional, the Receiver will pursue those claims as well and, if necessary, commence litigation to ensure recovery for the Estate.

> *v. Cooperation with Investors' Counsel for Claims Brought on Behalf of Individual Investors Against Third Parties*

As discussed in the Receiver's Second Status Report [D.E. 66], many of the investors (approximately 40, hereinafter the "FINRA Claimants") have filed arbitration actions against third parties under the auspices of the Financial Industry Regulatory Authority ("FINRA"). Since filing the Second Status Report, the Receiver and her counsel have continued to assist the FINRA Claimants' counsel by providing them access to certain categories of documents, assisting with locating certain relevant documents, reviewing all documents to ensure there are no privilege or confidentiality concerns that would preclude production and, when appropriate, providing the documents to the FINRA Claimants' counsel. The Receiver will continue to take reasonable and cost effective measures to assist the FINRA Claimants with their claims.

> *vi. Potential Claims Against Fraudulent Transferees*

After thorough investigation, the Receiver and her forensic accountant had discovered and identified certain individuals and institutions that have either received more money than they invested with the Receivership Defendants (the "Net Winners"), or have received money from the Receivership Defendants without any investment (the "Potential Fraudulent Transferee"). The Receiver has prepared demand letters for delivery to these Net Winners and Potential Fraudulent

7

Transferees demanding the return of any gains they received during the time that Price and the Receivership Defendants committed the fraud.  The Receiver intends to aggressively pursue any claims the Estate may have against both categories.

### vii.   FDIC's Motion to Intervene

As explained in the Receiver's Initial Report [D.E. 47], the FDIC, as receiver for MB&T, filed a motion to intervene in this matter on August 8, 2012 [D.E. 19].  On December 10, 2012, the FDIC amended its motion to intervene [D.E. 56], and on February 4, 2013, the Receiver filed her Response [D.E. 67]. Subsequently, on February 21, 2013, the FDIC filed its Reply brief [D.E. 68]. On March 1, 2013, the parties submitted a Joint Motion to Stay Proceedings related to the FDIC's Motion to Intervene [D.E. 69].  On March 4, 2013, this Court entered an Order denying the FDIC's Motion to Intervene [D.E. 19] without prejudice, denied the Joint Motion to Stay [D.E. 69] as moot, and ordered the SEC and the FDIC to submit a joint status report resolving the issues raised in the Motion to Intervene [D.E. 19]. On April 5, 2013, the parties submitted their Joint Status Report [D.E. 79] indicating that the parties were making progress on a resolution, but that an agreement had not yet been reached.  The parties continue to work toward an agreement.

B.    Claims Against Life Insurance Policies

Prior to the filing of the Second Status Report [D.E. 66], the Receiver had recovered $1,038,414.48 from one of the four existing life insurance policies of Defendant Aubrey Lee Price against which she submitted claims – the GE Capital Assurance/Genworth Financial policy.  Since filing her Second Status Report, the Receiver has continued to pursue the Estate's claims against the three remaining life insurance policies.

On March 11, 2013, HSBC remitted two checks to the Receiver, one for $500,000 and the other for $43,561.64, pursuant to the Receiver's claim.  The Receiver continues to pursue the Estate's claims against the Athene/Liberty Life insurance policy and the MetLife policy but has not received a response or payout as to those policies since the filing of the Second Status Report.[2]

To date, the Receiver has received a total of $1,582,976.12 in proceeds from life insurance policies, and is pursuing at least $550,000.00 from Athene/Liberty and MetLife.

---

[2] Athene/Liberty Life notified the Receiver that it required a certified copy of Price's death certificate, which the State of Florida's Bureau of Vital Statistics previously had not issued.  Accordingly, the Receiver inquired with that bureau as to the issuance thereof, and ordered the certificate.

C.   FDIC's Claim Against the Errors and Omissions Insurance Policy

As explained in the Receiver's Second Status Report [D.E. 66], the FDIC had submitted a demand and notice to Evanston Insurance Company ("Evanston"), with which Montgomery Asset Management, LLC ("MAM") holds an E & O Policy, of a potential claim against MAM and its members for losses allegedly sustained as a result of MAM's members' misconduct, and the Receiver timely notified Evanston of such claim and sought to invoke coverage.[3]  Since filing the Second Status Report, the FDIC has not advanced such claim through litigation or other means known to the Receiver.  The Receiver will take all necessary action in response to any such claim and investigate whether the Receivership Estate has any competing claim.

D.   Loans, Investments and Business Ventures

Mr. Price and the Receivership Defendants engaged in various lending practices, investments and business ventures during the time they perpetrated their fraudulent scheme.  Since filing her Second Status Report [D.E. 66], the Receiver recovered loan proceeds from Gary Olin, and has made progress in connection

---

[3] The policy has a per-claim limit of $1,000,000 and an aggregate claim limit of $2,000,000.

with determining whether the Estate was owed proceeds of a loan made to Anfe Woodrum and her company, A & D Hospitality, Inc.

### i.  Gary Olin

As explained in the Receiver's Second Status Report [D.E. 66], Gary Olin, who purchased real property and received a loan in the amount of $86,250.00 from Defendant PFG, LLC, agreed to sell that property in order to pay the Receiver the entire outstanding balance of the loan.

On February 28, 2013, Mr. Olin, with the assistance of the Receiver's realtor, Atchley International Realty, Inc., sold the property for $140,000. Subsequently, on March 7, 2013, the Receiver was paid the entire balance of the loan plus interest ($83,233.70) from the proceeds of the sale of the property.

### ii.  Anfe Woodrum / A&D Hospitality

As described in the confession letter Mr. Price wrote before his disappearance (and presumptive death), PFG, LLC and PFG Asset Management, LLC (the Predecessor to MAM) issued a loan, or several loans, to Anfe Woodrum and/or the company with which she was affiliated, A&D Hospitality, Inc., in the amount of approximately $107,000.  After determining that Ms. Woodrum and A&D Hospitality, Inc. had received such amount from the two Receivership Defendants, on January 28, 2013, the Receiver served demand letters upon Ms.

Woodrum and A&D Hospitality, Inc., demanding payment of the loan proceeds plus interest.

On February 22, 2013, Ms. Woodrum replied to the demand letter via e-mail, denying that she ever benefitted from her transactions with the Defendants, and claiming that she lost more than $110,000 in connection with her dealings with Mr. Price.  In light of Ms. Woodrum's response, the Receiver is investigating the validity of her claims and will determine whether the Estate has valid claims and should pursue legal action against Ms. Woodrum and A&D Hospitality, Inc.

E.     Real Property

As detailed in her Initial Report [D.E. 47], the Receiver took possession or control of six properties in Bradenton, Florida, one property in Longboat Key Florida, two properties in Sarasota, Florida, one shopping center in Kingsland, Georgia, one 71-acre plot of land designated for timber and/or hunting in Lyons, Georgia, and one farm in Venezuela (with an interest in two other farms). The Receiver has sold four residences in Florida in total (two of which were sold since filing her Second Status Report), continues to market the other real properties for sale, and continues to manage and collect rent payments from the tenants at the shopping center.

*i. Sale of Florida Properties*

Since filing her Second Status Report [D.E. 66], the Receiver has sold one property located at 3500 Conquistador Parkway, Unit 120, Bradenton, Florida, 34210 (the "3500 Property"), previously owned by Defendant Aubrey Lee Price, and the closing on the sale of another property located at 6033 34th Street W, Unit 136, Bradenton, Florida, 34210 ("Harbor Pines Unit 136"), previously owned by PFG, LLC, is pending the receipt of funds from the buyer in Colombia.

As required by the Receivership Order [D.E. 20], on March 12, 2013, the Receiver filed a motion to approve the sale of the Harbor Pines Unit 136 [D.E. 72], which the Court granted on April 1, 2013 [D.E. 76].   On April 4, 2013, the Receiver filed a motion to approve the sale of the 3500 Property [D.E. 77], which the Court granted on April 5, 2013 [D.E. 78].

 The 3500 Property sold for a purchase price of $122,000.00.  The closing for the 3500 Property took place on April 18, 2013, and the Estate received a total of $101,886.73 as net sale proceeds after payment of closing costs and broker fees.

The closing for Harbor Pines Unit 136, for a purchase price of $42,500.00, was scheduled for April 29, 2013, but as of the filing of this Report, that sale did not close because of a delay in the transfer of the sale proceeds from the buyer in Colombia. The Receiver anticipates that she will receive the funds within one week

of filing this Report. The Estate will receive a total of $37,401.86 as net sale proceeds after payment of closing costs and broker fees.

To date, the total amount the Estate will receive in proceeds from the sale of real property of the Receivership Estate is $244,429.75.

Also, since filing her Second Status Report, the Receiver located a buyer for the property located at 6033 34th Street W, Unit 64, Bradenton, Florida, 34210 ("Harbor Pines Unit 64") for a sale price of $42,500. The Receiver intends to file a motion for Court approval of the sale of Harbor Pines Unit 64 in the near future.

The Receiver will continue to actively market the remaining real properties of the Estate for sale, and will file a motion to approve any sale that the Receiver believes is for fair market value or otherwise in the best interest of the Estate.

## ii. Management of Kingsland Shopping Center

Early in the Receivership, the Receiver took possession of a shopping center, known as the Shops at Laurel Island Plantation, located at 102 Marsh Harbour Parkway, Kingsland, Georgia 32548. The Receiver and her property manager, Donna Hetzel of ReMax, continue to manage the property, pay all associated expenses, and collect monthly rent payments from the five tenants currently renting commercial spaces at the shopping center.

Since filing the Receiver's Second Status Report [D.E. 66], the Receiver has collected $19,261.63 ($6,850.40 for February, $6,847.23 for March, and $5,564.00 for April) in monthly rent payments from the tenants at the shopping center, which amount the Receiver has deposited into a separate trust account she opened to hold the rent collections for this property.  *See* Rental Account Reconciliation attached hereto as **Exhibit B**.  The Receiver, with the assistance of her property manager, will continue to collect rent payments, deposit those payments into the separate trust account, and make necessary repairs and perform common area maintenance to the property.

### iii.  Venezuela Properties

As explained in the Receiver's Initial Report, Defendant Aubrey Lee Price used investor funds to purchase three operating farms in agricultural regions of Venezuela.  Since filing her Second Status Report, the Receiver has secured the transfer of proceeds of the previous harvest from one of the farms to the Receiver's Venezuela counsel's trust account.  The Receiver has engaged a property manager in Venezuela, and is using a portion of the proceeds from the previous harvest to manage the operations of the farm until it can be sold.  The three farms in which the Estate has an interest will begin planting for this season's harvest.  The

Receiver, with the assistance of her counsel in Venezuela, will continue to market the farms for sale to the extent possible in Venezuela.

Due to the volatile political and economic climate in Venezuela, the farms' productivity and value are generally unstable. Nevertheless, the Receiver will endeavor to maintain the farms' status quo until the country's economic and political conditions improve and/or the property may be sold.

### iv. Sale of Osama Lwis Condominium Unit

As described in the Receiver's Second Status Report [D.E. 66], Osama Lwis, a Venezuelan businessman and long-time associate of Mr. Price, had obtained a nominal interest in at least two of the farms in Venezuela. As partial payment for the interest in one of the farms, Mr. Lwis had agreed to transfer his interest in a condominium unit located in Kissimmee, Florida to Mr. Price. Subsequent to the entry of the Receivership Order [D.E. 20], Mr. Lewis acknowledged to the Receiver that he was indebted to the Estate for the interest he had obtained in one of the farms. Accordingly, Mr. Lwis agreed to sell the condominium and transfer all of the net sale proceeds (after satisfaction of the mortgage and closing costs) to the Receiver. On March 7, 2013, the condominium was sold for $170,000, and the net sale proceeds totaled $21,620.43. Of these sale proceeds, $4,620.43 was immediately transferred to the Receiver. The remaining $17,000 in proceeds had to

be transferred to, and held in escrow by, the Department of the Treasury, to be released upon the Internal Revenue Service's determination that Mr. Lwis does not owe any income tax payments.   If those funds, or any portion thereof, are ultimately released, they will be transferred to the Receiver.

F.   Forensic Analyses

Since the filing of the Receiver's Second Status Report [D.E. 66], a substantial portion of the Receiver and her professionals' efforts were focused on gathering financial records necessary to complete the consolidated Bank reconstruction for all Receivership Defendants and related entities, and performing thorough forensic analyses of all the transactions related to the Receivership Defendants in order to aid the Receiver in tracing the investors' funds, determining the location of Receivership assets and identifying Potential Fraudulent Transferees, other third party transferees of Receivership assets, and other sources of recovery for the Estate.

i. Bank Reconstruction

The Receiver's forensic accountants, Kapila & Company ("KCO"), continue to analyze the ongoing production of Receivership and related entities' bank records pertaining to nearly 80 bank accounts.   These bank accounts include checking, savings and investment accounts held at numerous financial institutions.

The document productions that KCO has analyzed include bank statements, checks, and other supporting items for the period of July 2007 through August 2012. KCO maintains a detailed inventory of the various bank records that the Receiver obtained from these institutions, including a summary of activity and monthly account balances for each of the bank accounts.

KCO reconstructed the transactions in 54 selected bank accounts[4] totaling approximately 15,300 transaction line items.  KCO utilized the bank reconstruction to complete the following specific tasks requested by the Receiver to assist in her investigation:

- Prepared a summary of the bank reconstruction and a flow chart illustrating the cash inflows and outflows of the Receivership Entities;

- Analyzed the transfers to and from the Receivership Entities relating to the MB&T stock purchase;

- Identified transfers to and from MB&T post stock purchase;

- Analyzed transactions between KM Homes, LLC and the Receivership Entities;

- Traced investor funds and prepared an investor database;

- Prepared a preliminary transaction analysis of Potential Fraudulent Transferees; and

---

[4] The bank accounts reconstructed also include investment and savings accounts. Trading gains and losses were calculated by determining cash deposited into investment accounts less cash received back from investment accounts.

- Created detailed transaction reports and supporting documentation as requested by Counsel on an as needed basis.

### ii. Forensic Analyses

Within thirty (30) days of filing this Status Report, the Receiver will file a supplement that provides preliminary forensic analyses performed by KCO, including, without limitation, analyses of transfers to and from the Receivership Defendants, transactions related to the MB&T stock purchase, investor inflows and outflows, and transactions involving Potential Fraudulent Transferees.

### G.   Discovery

Since filing her Second Status Report [D.E. 66], the Receiver and her counsel have continued to serve subpoenas on various financial institutions, including banks and brokerage firms, insurance companies, and other entities and persons discovered to have any involvement with the Receivership Defendants, their assets, and the transfers of investor funds.  The status of the responses and document production as to each subpoena is set forth in the Receiver's updated Subpoena Report, attached hereto as **Exhibit C**.

## III.   ACCOUNTING OF RECEIVERSHIP FUNDS

The Receivership Estate currently has cash on hand in the amount of $1,803,583.81 (not including rent collections from the shopping center tenants or

funds held in trust in the Receiver's Venezuela counsel's accounts), which the Receiver is holding in the Estate's trust accounts at Gibraltar Private Bank & Trust. *See* Receivership Receipts and Disbursements attached hereto as **Exhibit D**.  The Receiver is holding a total of $19,079.08 in rent collections (after payment of expenses) from the Kingsland Property in a separate account. *See* Exhibit B.

### IV.    INVESTORS AND/OR CREDITORS

The Receiver has compiled a list of all known investors and/or creditors of the Receivership Defendants.  The most current list is attached hereto as **Exhibit E**.

### V.    ADMINISTRATIVE EXPENSES

The administrative expenses of the Estate are the expenses that the Estate has incurred in connection with marshaling, maintaining and preserving the assets of the Estate, including the real properties, which are reflected on the Receipts and Disbursements attached as Exhibit D, as well as the fees and costs incurred by the Receiver and the professionals this Court approved to assist her in carrying out her duties under the Receivership Order.

Since filing her Second Status Report [D.E. 66], the Receiver has prepared and filed a second request to approve and pay the fees and costs of the Receiver and her professionals.  In particular, on March 1, 2013, the Receiver filed her

Second Application for Order Authorizing Payment of Fees and Expenses [D.E. 70], seeking approval and authority to pay from the funds in the Estate the fees and costs incurred by the Receiver and her professionals during the second application period (November 1, 2012 through January 31, 2013). On March 19, 2013, this Court granted that Application [D.E. 73]. The court-approved fees and costs paid to the Receiver and her professionals pursuant to that order are reflected in Exhibit D.

## VI.   CONCLUSION

The Receiver will continue to work with her team of professionals to locate and marshal any and all assets of the Estate that have not yet been recovered. In particular, the Receiver will continue to investigate and gather information regarding the Receivership Defendants' assets and transactions through subpoenas, depositions and other inquiries to financial institutions and other entities and persons connected to the Receivership Defendants and their financial scheme to discover additional potential assets of the Estate, potential claims against third parties, and other sources of recovery. The Receiver and her professionals will analyze all documents obtained and, with the assistance of her forensic accountants in particular, will trace all transfers of funds for the purpose of recovering those funds or assets purchased therewith for the benefit of the Estate. Further, as

authorized by the Receivership Order, the Receiver will continue to aggressively pursue existing and potential claims against third parties on behalf of the Estate. The Receiver will also continue her efforts to sell the real property of the Estate and will seek Court approval for the sale of any such property.   Finally, the Receiver will continue to perform all other duties as mandated by the Receivership Order and will update the Court at the end of every calendar quarter as to the status of the Receivership.

Respectfully submitted this 30th day of April, 2013.

DAMIAN & VALORI LLP
*Counsel for the Receiver*
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: 305-371-3960
Facsimile: 305-371-3965

/s/ Kenneth Dante Murena
Kenneth Dante Murena, P.A.
Florida Bar No. 147486
*Admitted Pro Hac Vice*

HOLLAND & KNIGHT LLP
/s/ John M. Hamrick
John M. Hamrick
Georgia Bar No. 322079
Suite 2000, One Atlantic Center
1201 West Peachtree Street, N.E.
Atlanta, Georgia 30309-3453
(404) 817-8500
(404) 881-0470 (fax)
john.hamrick@hklaw.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of **Receiver's Third Status Report** was served via CM/ECF this 30th day of April, 2013, upon all counsel of record and to all parties listed on the attached Service List.

/s/ Kenneth Dante Murena
Kenneth Dante Murena, P.A.
Florida Bar No. 147486
*Admitted Pro Hac Vice*
DAMIAN & VALORI LLP
*Counsel for the Receiver*
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: 305-371-3960
Facsimile: 305-371-3965


HOLLAND & KNIGHT LLP
/s/ John M. Hamrick
John M. Hamrick
Georgia Bar No. 322079
Suite 2000, One Atlantic Center
1201 West Peachtree Street, N.E.
Atlanta, Georgia 30309-3453
(404) 817-8500
(404) 881-0470 (fax)
john.hamrick@hklaw.com

## SERVICE LIST

W. Shawn Murnahan, Esq.
   Email: murnahanw@sec.gov
Elizabeth Skola, Esq.
   Email: skolae@sec.gov
Securities and Exchange Commission
950 East Paces Ferry Road, N.E., Ste.
900
Atlanta, GA 30326
*Via CM/ECF*

Robert J. Waddell, Jr., Esq.
*Counsel for FDIC*
   Email:
rwaddell@mcguirewoods.com
Laura E. Reinhold, Esq.
   Email:
lreinhold@mcguirewoods.com
McGuire Woods, LLP
Suite 2100, Promenade II
1230 Peachtree Street, NE
Atlanta, GA  30309
*Via CM/ECF*

Kathryn Giardina
c/o Robert E.L. Garner, Esq.
   Email: relg@hsy.com
Haskell Slaughter Young & Rediker,
LLC
2001 Park Place, Suite 1400
Birmingham, Alabama  35203
*Via E-Mail*
Michael J. Athans, Esq.
*Attorney for Evanston Insurance*
   Email: mathans@fieldshowell.com
191 Peachtree Street NE, Suite 4600
Atlanta, GA 30303
*Via CM/ECF*