# **EXHIBIT C**

03173581.1

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF GEORGIA
 2                        ATLANTA DIVISION

 3                    No. 1:12-cv-2296-TCB

 4   SECURITIES AND EXCHANGE
     COMMISSION,
 5
                   Plaintiff,
 6   vs.

 7   AUBREY LEE PRICE; et al,

 8                 Defendants.
     _____/
 9
                                 1000 Brickell Avenue
10                               Miami, Florida
                                 December 15, 2014
11                               1:09 p.m. - 6:04 p.m.

12

13          DEPOSITION OF MELANIE F. DAMIAN

14

15      Taken before SUZANNE VITALE, R.P.R., F.P.R.

16   and Notary Public for the State of Florida at Large,

17   pursuant to Notice of Taking Deposition filed in the

18   above cause.

19

20

21

22

23

24

25
```

```
 1        Q.   Can you describe for me what you
 2   understand your duties are as receiver in this
 3   lawsuit?
 4        A.   My duties of the receiver are set forth in
 5   the receivership order appointing the receiver and
 6   so that's, I think, 40 pages.
 7             But, in essence, the responsibilities of
 8   the receiver are to accumulate all the assets of the
 9   receivership entities to determine whether there are
10   assets or litigation that should be prosecuted in
11   order to obtain additional assets and, ultimately,
12   create a claims process and distribute the proceeds
13   to the victims of the fraud and creditors.
14        Q.   Do you believe, as a receiver, you are an
15   officer of the court?
16        A.   I do.
17        Q.   And as a receiver and as an officer of the
18   court, do you believe you have a duty of honesty in
19   discharging your duties as receiver?
20        A.   I do.
21        Q.   Approximately how many cases have you
22   acted as receiver?
23        A.   You know, I didn't bring my CV.
24        Q.   Do you have that here in the office?
25        A.   I do.  I can get it during a break.  Let
```

```
 1   correct?
 2       A.   Correct.
 3       Q.   And it's your contention in this lawsuit
 4   that, despite the fact that Mr. Price is alive, that
 5   you don't have to return these proceeds to
 6   Protective and Household, correct?
 7       A.   Correct.
 8       Q.   Tell me all the facts why you contend
 9   that?
10       A.   I think we're still working on the facts.
11   But, essentially, it's our position that the
12   payments were voluntary under the Florida Voluntary
13   Payment Code or statute, and so in terms of the
14   facts we provided, we believe a good faith claim to
15   the insurance companies with the information we had
16   at the time that Mr. Price was missing, had sent a
17   suicide note, had told his family he was killing
18   himself, and that there was no evidence of him being
19   alive after I guess it's June 16th.  I don't
20   remember exactly the date that he called his wife
21   and said he was on the ferry.
22            But the date of his ferry, there was no
23   evidence after that of him being alive and we
24   provided that information, along with the
25   presumptive death certificate, to the insurance
```

1  wouldn't be able to do, and answer the questions the

2  best I could.

3           You know, I think they appreciated having

4  answers even if they didn't like the answers, but

5  it's a really good group of people.  It's a little

6  different.  Some of these receiverships, you have

7  people that - different, you know, more greedy.

8  They're investing in something that is too good to

9  be true.  That wasn't the case here.  These were

10 good people.

11      Q.   Your conversations with the individuals

12 listed in interrogatory number two, after speaking

13 with them, did you form an opinion as to whether

14 Mr. Price was alive or deceased?

15      A.   I don't think meeting with them affected

16 my opinion.

17      Q.   What was your opinion at this time?

18      A.   My opinion at that time was that he was

19 deceased.  But it was his family that made me

20 convinced about that.  I think they believed that.

21          Whether they knew something or not, I have

22 no idea.  When I met with them, they believed he was

23 dead.

24      Q.   Again, no one listed in interrogatory

25 number two ever told you -- strike that.

```
 1        A.    No, we did not.
 2        Q.    Is there an agreement with Miss Price as
 3   to not suing her?
 4        A.    No.  I can sue her.  She doesn't have any
 5   assets.
 6        Q.    Do you plan to sue Miss Price?
 7        A.    Not at present.
 8        Q.    In connection with your submission of this
 9   acknowledgment for petition for declaration of death
10   and presumptive death certificate, what documents or
11   evidence did you have that led you to believe that
12   Price was deceased?
13        A.    Nothing, other than what we've already
14   discussed.
15        Q.    Is there a specific document or piece of
16   evidence?
17        A.    Well, the confession, the interviews that
18   I had, the information that I obtained, the
19   discussions I had with the FBI, the discussions I
20   had with his family.  Nothing further.
21              (Thereupon, the referred-to document was
22   marked by the court reporter for Identification as
23   Exhibit 10.)
24
25
```

```
 1              (Thereupon, the referred-to document was
 2    marked by the court reporter for Identification as
 3    Exhibit 11.)
 4    BY MR. FEINBERG:
 5         Q.   I'm going to show you what I've marked as
 6    Defendant's Exhibit 10 and Defendant's Exhibit 11.
 7              Defendant's Exhibit 10 is Bates labeled
 8    Household 14 through Household 21.  Defendant's
 9    Exhibit 11 is Bates labeled Protective 132 through
10    Protective 139.
11              Miss Damian, have you seen these documents
12    before?
13         A.   Yes.
14         Q.   What are these documents?
15         A.   These are letters from my counsel to HSBC
16    Insurance and a letter from my counsel to Athene
17    Life Insurance Company dated January 14, 2013.
18         Q.   And in these letters, you are making a
19    claim for the respective death proceeds of the
20    Household and Protective policies, correct?
21         A.   That's correct, as receiver.
22         Q.   And when you submitted this notice of
23    claim, did you believe Mr. Price to be deceased?
24         A.   Yes, I did.
25         Q.   As it turns out, this was a mistaken
```

1   belief because Mr. Price is alive, correct?
2       A.   As it turns out, Mr. Price is alive, yes.
3       Q.   Had you known Mr. Price was alive on
4   January 14, 2013, would you have made a claim for
5   the death proceeds of the Household or Protective
6   policies?
7       A.   No.
8       Q.   Had you known that Mr. Price was alive on
9   January 14, 2013, would you have had your attorneys
10  send a letter to Protective and Household seeking
11  the death benefits of the policies?
12      A.   No.
13      Q.   And anywhere in this correspondence,
14  Exhibit 10 and 11, did you inform Protective or
15  Household that the FBI was still searching for
16  Mr. Price?
17      A.   The documents speak for themselves.
18      Q.   I'm asking you.
19      A.   I'm telling you that the documents speak
20  for themselves.  We provided the information to the
21  carrier that Aubrey Lee Price disappeared after
22  having last been seen aboard the Key West Express, a
23  commuter boat traveling from Northern Florida to
24  Florida Keys.
25           Following extensive search by the U.S.

1  certificate of death and I don't know what your

2  client should have done, but it was a presumptive

3  Florida certificate of death along with the

4  presumptive order and they could have made whatever

5  investigation they wanted to make.

6     Q.  ==Well, short of producing a body, what do==

7  ==you think Protective or Household should have done==

8  ==to determine whether Mr. Price was deceased?==

9     A.  ==They could have done the same interviews==

10 ==that I did and they would have come to the same==

11 ==conclusion or maybe not.==

12    Q.  ==The conclusion that you came to that==

13 ==Mr. Price was deceased.==

14        ==Is that a yes?==

15    A.  ==Yes.==

16        (Thereupon, the referred-to document was

17 marked by the court reporter for Identification as

18 Exhibit 17.)

19 BY MR. FEINBERG:

20    Q.  I'd like to show you what I've marked as

21 Defendant's 17.

22    A.  It looks like part is missing.

23    Q.  Well, if you look at the fax ribbon at the

24 top --

25    A.  It's just like it cuts off.  It looks like

 1        Q.    Lack of diligence you say.

 2              So do you think Protective should have

 3   questioned your representation as an officer of the

 4   court, as you've testified, and as a receiver, that

 5   Mr. Price had died by suicide?

 6        A.    Yeah, I don't express an opinion about

 7   whether or not they should have questioned me.

 8              I express only my understanding of the

 9   voluntary payment doctrine and the information I

10   have from my counsel.

11              So as it relates to the legal basis of

12   what you were required to do, as a matter of law,

13   under the voluntary payment doctrine, I don't

14   express an opinion.

15              As it relates to the facts, I know that we

16   weren't interviewed or additional information was

17   not requested of us past the documents that we

18   provided, which I think were truthful at the time

19   submitted.

20        Q.    If you'll look at the Third Affirmative

21   Defense, it says, "The claims should be denied under

22   the doctrine of equitable estoppel."

23        A.    Yes.

24        Q.    Other than what you've expressed today, do

25   you have any facts - additional facts supporting

```
 1   clients and so there may be additional facts.
 2           With that caveat, I have told you what I
 3   know.
 4       Q.  After Mr. Price was discovered alive, both
 5   Protective and Household demanded the return of
 6   their money, correct?
 7       A.  That's correct.
 8       Q.  And you refused to return the policy
 9   proceeds, correct?
10       A.  That is correct.
11       Q.  After Mr. Price was discovered alive in
12   December of 2013, do you know of any contractual
13   provisions speaking to whether or not you had to
14   return policy proceeds?
15       A.  I am not aware of a contractual provision
16   that would require me to return the proceeds, so I
17   don't think that's supported by contract.  Our
18   position is also supported by the voluntary payment
19   doctrine and the equitable estoppel.
20       Q.  To your knowledge, do you have any
21   documents or facts that show Protective or Household
22   did not pay their respective claims under mistake of
23   fact that Aubrey Price was dead?
24       A.  Say that again.
25       Q.  To your knowledge, do you know of any
```

```
 1    documents that show that Household or Protective did
 2    not pay their respective claims under mistake of
 3    fact that Aubrey Price was dead, to your knowledge?
 4         A.   Am I aware of any documents -- so am I
 5    aware of documents that your clients knew he was
 6    alive at the time?
 7         Q.   Correct.
 8         A.   No.
 9         Q.   Again, do you think the insurers should
10    have questioned your representation, as a court
11    appointed receiver, that Mr. Price died by suicide?
12         A.   I don't think the answer can be -- I don't
13    think they necessarily should be questioning me as a
14    court appointed receiver what their obligations are
15    or their obligations.
16         Q.   All I'm asking is for your opinion.
17         A.   I don't have an opinion about that.
18         Q.   Do you think that a life insurer should
19    not be able to rely upon a presumptive death
20    certificate issued by court of law?
21         A.   I don't have an opinion about that.  I
22    think the law implies some duties that we are
23    asserting under the voluntary payment statute and
24    that that's dependent on the circumstances.
25              I don't personally have an opinion.
```

```
 1        A.   I don't have an opinion either way.
 2        Q.   What do you think Protective or Household
 3   should have done after you submitted your claim?  Do
 4   you think they should have paid or not paid in light
 5   of the facts?
 6        A.   Again, I'm aware of some law with regard
 7   to standards, but I have no personal opinion about
 8   what the nature of that investigation should have
 9   been.
10        Q.   In terms of whether they should have paid
11   the claim or not paid the claim, do you have any
12   opinions about that?
13        A.   I don't have a personal opinion about
14   that, no.
15        Q.   Do you think it was reasonable that
16   Household and Protective paid the claims under the
17   circumstances?
18        A.   Yes.
19        Q.   Had Protective not paid -- strike that.
20             Had Protective or Household not paid,
21   would you have sued them for the proceeds?
22        A.   I don't know.  I would have dealt with
23   that with my lawyers at the time.
24        Q.   Would you have initiated a Department of
25   Insurance proceeding against them?
```